**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| THOMAS L. TAYLOR III, solely in his capacity as Court-appointed Receiver for Robert A. Helms, *et al.*, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No.  15-cv-648 |
| GRADY H. VAUGHN III, | § § | |
| Defendant. | § | |

**PLAINTIFF RECEIVER'S ORIGINAL COMPLAINT
AGAINST GRADY H. VAUGHN, III**

## I.  SUMMARY

1.      The Receiver brings this action to recover damages to the Receivership Estate of Vendetta Royalty Partners, Ltd., *et al.*, caused by the Defendant's receipt of compensation from -- and participation in -- a multi-million dollar fraudulent Ponzi scheme perpetrated by Robert A. Helms ("Helms") and Janniece S. Kaelin ("Kaelin").

2.      On December 3, 2013 the Securities and Exchange Commission ("Commission") initiated the civil enforcement action styled *SEC v. Robert A. Helms, et al.*, Civil Action No. 1:13-cv-01036-ML (W.D. Tex. 2013) (the "Enforcement Action") ("EA Doc. _"). This Court, acting *ex parte*, entered an Order on the same day appointing Thomas L. Taylor III ("Receiver") as equity receiver for Helms, Kaelin, Deven Sellers, Roland Barrera, and several entities under their control (the "Vendetta Defendants")[1]. EA Doc. 11. The Court has ordered the Receiver to

---

[1] Helms, Kaelin, Deven Sellers ("Sellers"), Roland Barrera ("Barrera"), Vendetta Royalty Partners, Ltd. ("Vendetta Partners"), Vendetta Royalty Management, LLC ("Vendetta

take control of all assets of the Receivership Estate in order to make an equitable distribution to claimants injured by Helms and Kaelin's fraud. *Id*.

3.      Helms and Kaelin perpetrated their fraudulent Ponzi scheme primarily through Vendetta Partners and Vendetta Management, but also through several other entities under their control, including Iron Rock Partners, Technicolor Minerals, Barefoot Minerals and Haley Oil (collectively the "Vendetta Entities"). Through the Vendetta Entities, Helms and Kaelin raised approximately $31,400,000 in proceeds from investors (the "Vendetta Offering").

4.      In raising these proceeds, Helms and Kaelin represented to investors that Vendetta Partners generated profits from a portfolio of oil-and-gas royalty interests, which profits would be distributed to investors as partnership distributions. In reality, however, Vendetta Partners' royalty revenues fell far short of covering its legitimate business expenses, meaning there were no profits which Helms and Kaelin could have used to make partnership distributions. To cover this shortfall, Helms and Kaelin paid these partnership distributions using later investors' money -- the primary attribute of a Ponzi scheme.

5.      Helms and Kaelin -- who represented that 99.14% of investor proceeds in the Vendetta Offering would be used to acquire royalty interests -- misappropriated tens of millions of dollars of these proceeds for purposes contrary to the representations made to investors, including to pay: (A) personal expenses for themselves and their families, friends, and associates; (B) business expenses, to keep their scheme afloat; and (C) the aforementioned Ponzi payments, made to investors to conceal their misappropriation and Vendetta Partners' failing

---

Management"), Vesta Royalty Partners, LP ("Vesta Partners"), Vesta Royalty Management, LLC, Iron Rock Royalty Partners, LP ("Iron Rock Partners"), Iron Rock Royalty Management, LLC ("Iron Rock Management"), Arcady Resources, LLC, Barefoot Minerals, G.P. ("Barefoot Minerals"), G3 Minerals, LLC, Haley Oil Company, Inc. ("Haley Oil"), Lake Rock, LLC, SeBud Minerals, LLC and Technicolor Minerals, G.P. ("Technicolor Minerals").

financial condition. Helms and Kaelin also obfuscated their scheme by comingling vast sums of money among the Vendetta Entities and other entities under their control, and engaging in sham transactions and accounting entries.

6.      Helms and Kaelin's Ponzi scheme could not have succeeded without the assistance and participation of others. In this regard, they deployed a team of unlicensed "brokers" to recruit investors into the scheme, and compensated them at levels far in excess of the limits represented to potential investors.

7.      One such "broker" who offered the securities underlying the Ponzi scheme was Defendant Grady H. Vaughn, III ("Vaughn"), notwithstanding that he was not licensed to do so. Vaughn recruited investors into the Vendetta Ponzi scheme through the medium of Upland Energy Partners, LP ("Upland Partners"), a limited partnership which Vaughn created for the purpose of investing proceeds into Vendetta Partners. Vaughn owned and controlled 100% of Upland Partners' general partner, Upland Resources, LLC ("Upland Resources"). Vaughn raised approximately $1,300,000 from investors through the sale of Upland Partners securities, and invested $1,200,000 of those funds into Vendetta Partners in or about October 2012. On information and belief, he retained the balance of those proceeds for himself.

8.      In addition to his recruitment of the Upland Partners investors into the Vendetta Ponzi scheme, Vaughn became increasingly involved in Vendetta Partners' day to day operations. He moved to Austin in or about December 2012 and began to work closely with Helms and Kaelin at the Vendetta Entities' offices. At that time, Vaughn became the *de facto* -- if not the actual -- Chief Operating Officer of Vendetta Partners. Vaughn continued to work for Helms and Kaelin's fraudulent operation up until the time that the Commission initiated the

Enforcement Action and the Receiver was appointed, including as the Chief Operating Officer of Iron Rock Partners.

9.      When Helms and Kaelin decided to extend their Ponzi scheme beyond Vendetta Partners, they did so through an additional offering through the entity Iron Rock Partners (the "Iron Rock Offering"). Vaughn agreed to become the Chief Operating Officer of Iron Rock Partners. Vaughn was integrally involved in the creation of Iron Rock Partners and the implementation of the Iron Rock Offering. A single investor had subscribed to the Iron Rock Offering at the time the Receiver was appointed. Helms and Kaelin, as they had done with the proceeds of Vendetta Partners investors, misappropriated these funds, comingled them with the assets of other Vendetta Entities, and used them in furtherance of their Ponzi scheme.

10.      Helms and Kaelin paid approximately $300,000 from the Vendetta Entities to, or for the benefit of, Vaughn between July 2012 and December 2013. These amounts were far in excess of the levels of "promotional expenses" represented to potential investors in offering materials. The Receiver's investigation is continuing, and should more payments of investor proceeds to or for the benefit of Vaughn be discovered, the Receiver will supplement this Complaint to assert claims regarding such additional payments.

11.      Because the payments to, and for the benefit of, Vaughn were made from a Ponzi scheme, they were presumptively made with intent to hinder, delay or defraud creditors. *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) ("The Receiver's proof that RDI operated as a Ponzi scheme established the fraudulent intent behind transfers made by RDI."). Accordingly, the Receiver seeks the avoidance of these transfers pursuant to the Texas Uniform Fraudulent

Transfer Act, TEX. BUS. & COM. CODE §§24.001 *et seq*. ("TUFTA"), and other applicable law.[2] Liability for these avoided transfers lies with either the first transferee, the person for whose benefit the transfer was made, or any subsequent transferee. TUFTA §24.009(b). In other words, Vaughn is liable for transfers made to him and to others for his benefit.

12.     While TUFTA provides affirmative defenses against such avoidance,[3] they are not available to Defendant. The U.S. Court of Appeals for the Fifth Circuit has held that as a matter of law, services in furtherance of a Ponzi scheme, including introducing new investors into the scheme, do not confer reasonably equivalent value. See *Byron*, 436 F.3d at 560 ("It takes cheek to contend that in exchange for the payments he received, the … Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments. … This argument is unacceptable.") (citing, *inter alia*, *Ramirez Rodriguez v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997) (stating that "as a matter of law, the Defendant gave no value to the debtors [Ponzi scheme operators] for the commissions attributable to investments made by others …")). Moreover, based upon the facts known to Vaughn, and his failure to conduct adequate or independent due diligence with respect to the Ponzi scheme, he cannot establish that he received these transfers with objective good faith. See *id.* (quoting *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995)) (good faith "is determined by looking at what the transferee 'objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.'"). Vaughn was aware of facts that would have induced

---

[2] See also *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 192 (5th Cir. 2013) ("Applying the principles of *Scholes* [*v. Lehmann*, 56 F.3d 750 (7th Cir. 1995)] and its progeny, we conclude that the Receiver has standing to assert the claims of [the receivership entities] … to recover" fraudulent transfers made from the Ponzi scheme).

[3] "A transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." TUFTA § 24.009.

a reasonable person to inquire further into Helms' and Kaelin's scheme, but he failed to do so. *In re Pace*, 456 B.R. 253, 275 (Bankr. W.D. Tex. 2011) (quoting *SEC v. Cook*, 2001 WL 256172, at *4, 2001 U.S. Dist. LEXIS 2601 (N.D. Tex. Mar. 8, 2001)) ("One lacks the good faith that is essential to the [TUFTA] defense to avoidability if possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction.").

13.     Through his actions, Defendant aided, abetted and participated in Helms and Kaelin's scheme through the unlawful Vendetta Offering, which Helms and Kaelin conducted through unlicensed "brokers" for the purpose of perpetrating a Ponzi scheme. In this regard, he conspired with Helms and Kaelin to effect the offering of Vendetta Partners securities by unlawful means, and is liable to the Receivership Estate, jointly and severally with his co-conspirators, for all damages resulting from the unlawful Vendetta Offering, and resulting from conduct of his co-conspirators in furtherance of the unlawful Vendetta Offering.

## II.   PARTIES

14.     Plaintiff **Thomas L. Taylor III** ("Receiver") has been appointed by this Court in the Enforcement Action as receiver for the Vendetta Defendants. In marshaling the assets of the Receivership Estate, the Receiver is authorized "to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto," EA Doc. 76 at ¶7(B), and "[t]o bring such legal actions based on law or equity…as the Receiver deems necessary or appropriate in discharging his duties." *Id*. at ¶7(I). Without limitation, the Receiver may seek the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution. *Id*. at ¶43. The Receiver is asserting the causes of action contained herein solely in his capacity as Court-appointed Receiver for the Vendetta Defendants.

15.     Defendant **Grady H. Vaughn, III** ("Vaughn") is an individual residing in the Colorado Springs, Colorado metropolitan area, and will be served pursuant to the Federal Rules of Civil Procedure.

### III.   JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77v(a)) and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa). Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute Receivership duties. Additionally, within 10 days of the entry of the Order Appointing Receiver (EA Doc. 11), the Receiver filed the Commission's Complaint and the Order Appointing Receiver in the United States District Court for the District of Colorado (Case No. 1:13-mc-00207). Accordingly, this Court has jurisdiction over Defendant pursuant to FED. R. CIV. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.

17.     Additionally, diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a). The Receiver seeks damages in excess of $75,000, exclusive of interest and costs. Moreover, Vaughn is a resident of Colorado. The Receiver brings the causes of action asserted herein on behalf of the Vendetta Entities, which at all times relevant to this Complaint conducted their business from Austin, Texas. Accordingly, complete diversity exists between the parties.

18.     This Court has personal jurisdiction over non-resident Vaughn under the Texas Long Arm Statute. Vaughn conducted continuous and systematic business in the State of Texas between at least July 2012 and December 2013, and is therefore subject to general jurisdiction. Furthermore, as described herein, Vaughn had numerous contacts with the State of Texas, specifically with the Vendetta Entities in Austin, Texas, including living in Austin, Texas

between approximately December 2012 and December 2013. These contacts by Vaughn give rise to the Receiver's causes of action, and therefore Vaughn has done business in the State of Texas, and has aided, abetted and participated in, and conspired to commit, torts in the State of Texas.

## IV.  STATEMENT OF FACTS

### A.  The Enforcement Action and Appointment of the Receiver

19.     The Commission initiated the Enforcement Action on December 3, 2013, alleging, *inter alia*, that Helms and Kaelin violated the anti-fraud provisions of the federal securities laws through the offer and sale of the securities of Vendetta Partners. EA Doc. 1. This Court, acting *ex parte*, entered a Temporary Restraining Order on the same day (EA Doc. 10) ("TRO"), restraining and enjoining the Vendetta Defendants, *inter alia*, from further violating the anti-fraud provisions of the federal securities laws, and granting further ancillary relief enjoining the destruction of books and records, ordering interim accountings and authorizing expedited discovery.

20.     Contemporaneously with the TRO, this Court entered an Order Appointing Receiver (EA Doc. 11), appointing Thomas L. Taylor III as equity receiver for the Vendetta Defendants. The Court took "exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the [Vendetta] Defendants," *id*. at ¶1, and ordered the Receiver to take control of and marshal all assets and records of the Receivership Estate in order to make an equitable distribution to claimants injured by a massive fraud orchestrated by Helms and Kaelin. *Id*.

21.     Helms and Kaelin operated the Vendetta Entities as a single fraudulent enterprise. Upon evidence that Helms and Kaelin routinely comingled and conflated the assets of the

Vendetta Defendants, including the assets of Vendetta Entities,[4] the Receiver moved the Court to amend the Order Appointing Receiver to treat the various Vendetta Defendants as a single Receivership Estate. *See* EA Doc. 60-1 at, *e.g.*, ¶¶2, 7(A), 35 – 36. On May 27, 2014 this Court entered the First Amended Order Appointing Receiver (EA Doc. 76).

### B.  The Fraudulent Vendetta Ponzi Scheme

22.     Vendetta Partners was formed as of January 1, 2010 upon the divisional merger of the entity Robro Royalty Partners, Ltd. ("Robro"). Upon the formation of Vendetta Partners, limited partners owning approximately 43% of Robro's equity became limited partners in Vendetta Partners, and approximately 43% of Robro's assets and liabilities were transferred to Vendetta Partners. Helms and Kaelin alone controlled Vendetta Partners through its general partner Vendetta Management.

### a.   *The Unlawful Vendetta Offering*

23.     In 2011, Helms and Kaelin decided to raise additional proceeds from the public through a Regulation D private placement offering. The offer to public investors of securities in Vendetta Partners commenced in or about May 2011, and the first sales were made in July 2011, notwithstanding that Helms executed and caused to be filed with the Commission a Form D Notice of Exempt Offering of Securities, dated on August 15, 2011 ("Form D"), in which he represented that the first sale in the Vendetta Offering had yet to occur. *See* EA Doc. 5-2 at §7, also available at http://www.sec.gov/Archives/edgar/data/1527988/000152798811000001/xslFormDX01/primary_doc.xml.

---

[4] *See* EA Doc. 60-2, Declaration of Danielle Supkis Cheek, incorporated herein by reference.

24.     Helms and Kaelin effected the Vendetta Offering unlawfully, deploying numerous unlicensed and undisclosed "brokers" who agreed to recruit investors into the scheme, and compensating them at levels far in excess of the limits represented in the Vendetta Partners PPM. Vaughn was one such "broker" who offered the securities underlying the Ponzi scheme for compensation. In this regard, Helms represented in the Form D that Vendetta Management, Helms, and Kaelin were the only "promoters" and falsely stated that no promoter had received, or would receive, any sales compensation, commissions or finder's fees. *Id.* at §§3, 12, 15. Contrary to these representations, Helms and Kaelin paid approximately $1,800,000 in promotional expenses for the Vendetta Offering, *see, e.g.,* EA Doc. 259-1 pp. 1 – 36, Declaration of Danielle Supkis Cheek (incorporated herein by reference), at ¶30, including commission payments to Vaughn. *See* **Exhibit A** (attached hereto and incorporated herein by reference).

25.     The Vendetta Offering was effectuated through a private placement memorandum ("PPM"). Through the Vendetta Partners PPM, Vendetta Partners represented to potential investors that proceeds raised in the Vendetta Offering would be applied as follows:

|  | Application of Maximum Proceeds | Percent of Subscriptions |
| --- | --- | --- |
| Purchase cost of Royalty Interests | $49,570,500 | 99.14% |
| Loan Repayment | $ 379,500 | .76% |
| Promotional Expenses | $ 50,000 | .10% |
| TOTAL: | $ 50,000,000 | 100.00% |

26.     Vendetta Partners acquired funds from investors in the Vendetta Offering in exchange for equity interests in Vendetta Partners. Vendetta Partners received and had possession of these funds for particular purposes, namely for the deployment of these funds in a manner consistent with the terms of the Vendetta Partners PPM. Vendetta Partners legally possessed, and had a right to possess, these funds from investors. However, Helms and Kaelin

wrongfully exercised dominion or control over these Vendetta Offering proceeds, allocating the proceeds in a manner inconsistent with the terms of the Vendetta Partners PPM. In doing so, Helms and Kaelin misappropriated tens of millions of dollars of investor proceeds from Vendetta Partners.

27.     Helms and Kaelin did not use 99.14% of investor proceeds to purchase royalty interests. Helms and Kaelin raised approximately $31,500,000 from investors through the Vendetta Entities between July 2011 and December 2013. During the same time period, royalty interest assets increased, at most, by approximately $9,900,000. Even assuming this amount of increase in royalty interests is accurate, less than 33% of investor proceeds raised by Helms and Kaelin were used for the purchase of mineral interests. *See, e.g.,* EA Doc. 259-1 pp. 1 – 36 at ¶30.

28.     Helms and Kaelin further misappropriated millions of dollars of investor proceeds for the payment of undisclosed personal and business expenses -- including payments to unlicensed "brokers" in amounts far in excess of limits disclosed in the Vendetta Partners PPM -- and to make Ponzi payments to existing investors. These uses of proceeds were not disclosed in the Vendetta Partners PPM, in the Form D, or otherwise. In this regard, from January 1, 2010 to the appointment of the Receiver on December 3, 2013, the Vendetta Entities received approximately $4,000,000 in cumulative net royalty income. However, the business expenses of the Vendetta Entities far exceeded these revenues, meaning that payment of the remaining expenses and partnership distributions necessarily came from investor proceeds rather than profits from business operations.

29.     During this time period, Helms and Kaelin paid (A) approximately $8,400,000 in personal expenses for themselves and their families, friends, and associates (EA Doc. 259-1 at p.

13 ¶30); (B) approximately $12,800,000 for business expenses -- including over $1,800,000 for "promotional expenses" to unlicensed "brokers" and over $2,500,000 for debt service (*Id.*); and (C) approximately $8,670,000 in partnership distributions -- more than twice the cumulative net royalty income received by the Vendetta Entities during the same time period. *Id*. Their lavish personal spending included more than (i) $240,000 for Kaelin's daughter's wedding in Hawaii; (ii) $110,000 for airfare, including for the wedding; (iii) $100,000 for tuition; and (iv) $285,000 for mortgage payments. Helms and Kaelin also used investor funds to take a 23-day trip around the world during March – April 2012, at a cost of over $135,000.

### b. *The Vendetta Ponzi Scheme*

30.     As this Court has held previously, Vendetta Partners was operated as a Ponzi scheme. *See* EA Doc. 207 at 12 ("…Vendetta Partners became a classic Ponzi scheme."), at 14 ("the Court easily concludes … that Vendetta Partners was a Ponzi scheme").

31.     The term Ponzi scheme "describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d at 189. Apart from the "essential characteristic or pattern of payment of earlier investors with funds of later investors, the manner in which such schemes are conducted is limited only by the imagination of the perpetrator." *Kriegman v. Bigelow (In re LLS Am., LLC)*, No. 09-06194-PCW11, 2013 Bankr. LEXIS 2684, at * 20 (Bankr. E.D. Wash. July 1, 2013). "[T]here is no precise definition of a Ponzi scheme and courts look for a general pattern, rather than specific requirements." *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 12 (S.D.N.Y. 2007).

32.     As stated above, between approximately August 2011 and August 2013, Helms and Kaelin effected payments of approximately $8,670,000 to limited partners as partnership equity distributions -- not withstanding that business expenses far exceeded revenues from operations, and therefore these partnership equity distributions were not made from profits. Specifically, but without limitation, Helms and Kaelin made the following partnership distributions: (i) $187,836 on August 17, 2011; (ii) $650,000 on January 25, 2012; (iii) $222,000 on November 30 and December 1, 2012; and (iv) $255,841 on December 6-8, 2012. *See* EA Doc. 5-22, Declaration of Carol Hahn, at 8-9; EA Doc. 186-1, Declaration of Danielle Supkis Cheek, at 8-11 (each incorporated herein by reference). In each instance, Helms and Kaelin used investor funds to make these investor distributions. *Id*.

      c.   *The Iron Rock Offering*

33.     In or about January of 2013, Helms and Kaelin sought to continue their Ponzi scheme through Iron Rock Partners. Helms, Kaelin and others formed Iron Rock Partners and thereafter began to market the Iron Rock Offering. Vaughn agreed to be the Chief Operating Officer for Iron Rock Partners.

34.     At the commencement of the Enforcement Action and the appointment of the Receiver only one investor had subscribed to the Iron Rock Offering, investing $500,000. Helms and Kaelin misappropriated these proceeds, including transferring approximately $277,000 in investor proceeds from Iron Rock Partners to Barefoot Minerals between about June 27 and August 2, 2013, *see, e.g.*, EA Doc. 60-2 p. 5 Table 1, and making a Ponzi payment of approximately $100,000 to buy out a Vendetta Partners investor.

d. _Additional Acts of Helms and Kaelin in Furtherance of their Fraudulent Ponzi Scheme_

35.     Helms and Kaelin obfuscated their fraudulent Ponzi scheme through the continuous conflation and comingling of investor proceeds between and among the Vendetta Entities. _See_ EA Doc. 60-2 at Tables 1 – 5, Figure 1; EA Doc. 186-1 at ¶6.

36.     Helms and Kaelin further obfuscated their fraudulent Ponzi scheme by laundering over $5,000,000 in investor proceeds through sham transactions with the Enforcement Action Relief Defendants and other entities under Helms' and Kaelin's control, including the Vendetta Entities, and identifying in accounting records the return of these funds to Vendetta Partners as purchases of, and income from, oil and gas royalty interests. _See, e.g._, EA Doc. 186-1 at ¶19; EA Doc. 259-1 at p. 12 ¶¶29(a), 30.

37.     Helms and Kaelin extended their Ponzi scheme by continuously lying to limited partners about the value of the underlying portfolio of royalty interests, the business operations of the Vendetta Entities, the use of investor proceeds, and the preparation of the Vendetta Partners portfolio of assets for sale.

38.     Helms and Kaelin transmitted to investors a counterfeit audit of Vendetta Partners' oil and gas asset portfolio -- purportedly written by Haas Petroleum Engineering Services, Inc. ("Haas") -- to give investors the impression that the Vendetta Partners portfolio had an audited value of over $26 million. The letter, dated January 17, 2011, stated that as of December 30, 2010 Vendetta Partners owned over 18,000 properties worth over $26,189,000. As Helms and Kaelin knew or were reckless in not knowing, however, this letter was a fake. In reality, Haas did not perform an audit for Vendetta Partners during this time period. The last work that Haas did for any entity related to Vendetta Partners was an audit letter for the Robro

portfolio, dated August 14, 2009. This was one of only two audits that Haas performed for Robro.

39.     Helms and Kaelin represented in the Vendetta Partners PPM and other offering materials that over 99% of investor funds would be used to buy royalty interests. As they knew, since they were misappropriating funds as described above, these representations were false. Less than 33% of investor proceeds were used to purchase mineral interests.

40.     Helms and Kaelin also made at least $1,100,000 in loan payments to Amegy Bank -- approximately three times the amount disclosed to investors in the Vendetta Partners PPM. EA Doc. 5-22 at ¶11. They paid these excess amounts in an effort to cure delinquency and covenant violations in the loan agreement with Amegy. Helms and Kaelin knew about the loan delinquency, the covenant violations, and Amegy payment amounts, they did not disclose these material facts to investors -- in the Vendetta Partners PPM or otherwise.

41.     Helms and Kaelin also made material misrepresentations to investors about their professional backgrounds, representing that they had extensive experience in royalty-interest acquisitions and that they had successfully managed multiple portfolios. These representations were false. In Vendetta Partners marketing materials given to potential investors, Helms and Kaelin claimed that they had invested over $300 million since 2003, and had managed seven investment partnerships and achieved "consistent" and "significant" returns, including representations of gross returns of more than 700% to 1000% of proceeds raised. These statements were false -- Helms and Kaelin had neither invested $300 million nor managed seven partnerships, much less produced the returns claimed.

42.     Helms' only meaningful experience in this area consisted of his work for Robro, Vendetta Partners and its related entities -- the only experience that he did have previously was

focused on tax and estate planning work, not the acquisition and management of royalty interests.

43.     Kaelin greatly overstated her experience, including in marketing materials she and her unlicensed "brokers" distributed to potential investors as early as July 2011, which stated:

> In the early Nineties, after an extremely successful history in the offshore oil and gas industry Jeff Sanderfer [sic] set up and [sic] energy fund ($500M). Approximately 15 years ago, Janniece Kaelin was hired to run and manage royalty mineral rights for his fund. … Upon exit of the energy market, Sanderfer [sic] provided his "rolodex of wealthy industry and business contacts" and proprietary software (worth millions in development) to Kaelin and gave her the opportunity to do this on her on [sic]. Utilizing their years of experience and the wealth of contacts provided them, Kaelin and her team of experts then formed Vendetta Royalty Partners, Ltd.

None of these representations were true, as Kaelin knew. She never managed acquisitions for Sandefer's fund (which was not worth $500 million) nor worked closely with him, and he did not give Kaelin a rolodex of wealthy industry contacts or proprietary software worth millions in development. Kaelin's role was limited to cold calling land owners and attempting to get them to sell their mineral interests -- acquisitions which required separate approval by her superiors.

44.     Helms and Kaelin also made material representations regarding litigation against them and the entities they controlled, stating in PPMs that there were no material pending legal proceedings against them or their affiliates. In truth, a private party had sued Helms and Kaelin in December 2011, alleging that they committed fraud by purporting to sell mineral interests that they did not even own in exchange for $1.2 million. Additionally, the Illinois EPA had initiated action against Haley Oil in May 2012, alleging illegal "release incidents." Helms and Kaelin each owned 50% of Haley Oil.

45.     On numerous occasions starting in or about 2012, Helms and Kaelin represented that the sale of the Vendetta Partners portfolio was imminent, and that they had received offers to

purchase the Vendetta Partners portfolio for amounts in excess of $100 million. These representations were not true. Helms and Kaelin made these misrepresentations to placate increasingly impatient limited partners. They also made Ponzi payments, including those detailed above, to placate increasingly impatient limited partners and give their scheme an air of legitimacy.

          e.   *Helms and Kaelin Perpetrated their Ponzi Scheme in Breach of the Fiduciary and Other Duties they Owed to the Vendetta Entities*

46.    Helms and Kaelin were the sole owners, members and/or managers of, *inter alia*, Vendetta Management, Iron Rock Management, Barefoot Minerals, Technicolor Minerals, and Haley Oil. Helms and Kaelin were the general partners of, *inter alia*, Vendetta Partners and Iron Rock Partners through Vendetta Management and Iron Rock Management, respectively, and stood in the same fiduciary capacity to these limited partnerships as a trustee stands to the beneficiaries of a trust. Accordingly, they owed to these entities the fiduciary duties of good faith, fair dealing, fidelity, obedience, loyalty and due care. Helms and Kaelin also owed to the Vendetta Entities the duty not to operate them in a fraudulent manner.

47.    Helms and Kaelin -- interested owners, officers, members, managers and/or general partners under applicable law (see *Gearhart Indus. v. Smith Int'l*, 741 F.2d 707, 719 – 20 (5th Cir. 1984)) -- breached the fiduciary and other duties they owed to the Vendetta Entities in perpetrating their fraudulent Ponzi scheme.

48.    Helms and Kaelin continuously and systematically allowed their personal interests to prevail over the interests of the Vendetta Entities, and failed to exercise the degree of care which persons of ordinary prudence would exercise under the same or similar circumstances in their management of the affairs of the Vendetta Entities. Helms and Kaelin failed to exercise

unbiased or honest business judgment in pursuit of the interests of those entities. Helms and Kaelin further failed to exercise fidelity over the proceeds of investors in Vendetta Partners and Iron Rock Partners. In this regard:

      a.    Helms and Kaelin's misappropriations of millions of dollars of investor proceeds for the payment of undisclosed personal expenses, business expenses, and Ponzi payments were in breach of the fiduciary and other duties they owed to the Vendetta Entities.

      b.    Helms and Kaelin's extensive comingling of the assets of the Vendetta Entities was in breach of the fiduciary and other duties they owed to those entities.

      c.    Helms and Kaelin's obfuscation of their fraud through laundering of investor proceeds through round-trip sham transactions with entities under their control was in breach of the fiduciary and other duties they owed to the Vendetta Entities.

      d.    Helms and Kaelin's engagement of unlicensed "brokers" to effect the Vendetta Offering unlawfully and recruit investors into their fraudulent Ponzi scheme -- and misappropriate investor proceeds to compensate them above disclosed limits -- was in breach of the fiduciary and other duties they owed to the Vendetta Entities.

49.    Through the actions detailed above in breach of their fiduciary and other duties, Helms and Kaelin caused extensive damages to the Vendetta Entities, which damages are now liabilities of the Receivership Estate.

**C. Vaughn, Acting through the Medium of Upland Partners, Participated in the Unlawful Vendetta Offering and Helms' and Kaelin's Ponzi Scheme**

50.    Helms and Kaelin's Ponzi scheme could not have succeeded without the assistance and participation of others. Accordingly, they effected the Vendetta Offering

unlawfully, deploying numerous unlicensed "brokers" who agreed to recruit investors into the scheme, and compensating them at levels far in excess of the limits represented in the Vendetta Partners PPM and the Form D.

51.     Vaughn, acting through the medium of Upland Partners, was one such unlicensed "broker" who agreed to recruit victims for Helms' and Kaelin's scheme. The investors recruited by Vaughn invested approximately $1,300,000 into Upland Partners for the purpose of subscribing to the Vendetta Offering. Vaughn then invested $1,200,000 of these funds into Vendetta Partners. On information and belief, he retained the balance of those proceeds for himself. For his efforts, Vaughn received transfers of commissions from the Vendetta Entities. As Vaughn knew or should have known, he was raising proceeds for a securities offering contrary to disclosures made to investors and to the Commission with regard to sales compensation, commissions or finder's fees which had been -- or would be -- paid in the Vendetta Offering.

52.     Vaughn met Helms and Kaelin in or about the spring or early summer of 2012 through his son, Grady Hamilton Vaughn, who also had been engaged by Helms and Kaelin to promote and market the Vendetta Offering.

53.     After meeting Helms and Kaelin, Vaughn decided to recruit investors into the Vendetta Offering for compensation. Vaughn recruited investors into the Vendetta Ponzi scheme through Upland Partners. Vaughn owned and controlled Upland Partners' general partner Upland Resources. Vaughn offered and sold securities for Upland Partners to investors based upon representations that the proceeds would in turn be invested in Vendetta Partners. In recruiting these investors, Vaughn provided the Vendetta Partners PPM and other offering documents and marketing materials for the Vendetta Offering to potential investors. These offering documents

and marketing materials contained the false representations detailed at ¶¶25, 27 – 30, 35 – 44, *supra*.

54.     Vaughn, through the Vendetta Offering documents he received and distributed, was aware of the limits placed on promotional expenses in the Vendetta Partners PPM. Not withstanding these limitations, Vaughn agreed with Helms and Kaelin that he would be paid commissions of approximately 6% for the proceeds that Vaughn was responsible for recruiting into the Ponzi scheme. Upland Partners subscribed to the Vendetta Offering in or about October 2012, using $1,200,000 in proceeds from investors recruited by Vaughn.

55.     Vaughn regularly communicated with Helms, Kaelin, the Upland Partners investors and other potential investors and limited partners in the Vendetta Entities, including with respect to the purported business operations of the Vendetta Entities. He regularly passed along investor inquiries to Helms and Kaelin, and provided information from Helms and Kaelin to these potential and actual investors. Vaughn was actively involved in the exchange of information between Helms, Kaelin and the Vendetta Entities and potential investors and subscribed limited partners.

56.     In late 2011, at the request of Helms and Kaelin, Vaughn became increasingly involved in Vendetta Partners' day to day operations. Vaughn moved to Austin in or about December 2012 and began to work closely with Helms and Kaelin at the Vendetta Entities' offices. Vendetta Entities paid for Vaughn's residence during this time -- at over $2,500 per month -- and other related expenses such as maid service. *See* Exhibit A.

57.     During this time, Vaughn became the *de facto* -- if not the actual -- Chief Operating Officer of Vendetta Partners. Vaughn continued to work for Helms and Kaelin's fraudulent operation until the Commission initiated the Enforcement Action and the Receiver

was appointed in December 2013. Vaughn was compensated approximately $10,000 per month by Helms and Kaelin through payments from accounts in the names of Vendetta Partners and Vendetta Management. *See* Exhibit A.

58.     Additionally, when Helms and Kaelin decided to extend their Ponzi scheme beyond Vendetta Partners, they did so through an additional offering through the entity Iron Rock Partners (the "Iron Rock Offering"). Vaughn agreed to become the Chief Operating Officer of Iron Rock Partners. Vaughn was integrally involved in the creation of Iron Rock Partners and the implementation of the Iron Rock Offering. A single investor had subscribed to the Iron Rock Offering at the time the Receiver was appointed. Helms and Kaelin, as they had done with the proceeds of Vendetta Partners investors, misappropriated these funds, comingled them with the assets of other Vendetta Entities, and used them in furtherance of their Ponzi scheme. As Iron Rock Partners' Chief Operating Officer, Vaughn knew or should have know about these misappropriations of funds.

### D.  Vaughn Knew or Should Have Known, and/or was Reckless in Not Knowing, of the Conduct of Helms and Kaelin in Breach of their Duties to the Vendetta Entities, and Did Not Receive Transfers from the Vendetta Entities with Objective Good Faith

59.     Vaughn knew, should have known, or was reckless in not knowing of the unlawful activities of Helms and Kaelin in perpetrating the unlawful Vendetta Offering and fraudulent Vendetta Ponzi scheme. At worst, Vaughn had actual, subjective knowledge of the unlawful and fraudulent acts of Helms and Kaelin in furtherance of the unlawful Vendetta Offering and fraudulent Vendetta Ponzi scheme. At best, Vaughn had sufficient knowledge of actual facts which would induce a reasonable person to inquire further into Helms' and Kaelin's scheme. However, Vaughn recklessly turned a blind eye to these facts, and failed to conduct any independent due diligence with respect to Helms, Kaelin, the Vendetta Offering (including the

Vendetta Partners PPM and other marketing materials provided to him by Helms and Kaelin), or the Vendetta Entities. Accordingly, Vaughn cannot establish the TUFTA affirmative defense of objective good faith, and may be held jointly and severally liable with Helms and Kaelin for the damages sustained by the Vendetta Entities as a result of his aiding and abetting of, and participation in, and conspiracy to effect, the unlawful Vendetta Offering and fraudulent Vendetta Ponzi scheme.

60.     Vaughn knew or should have known that Helms and Kaelin controlled the Vendetta Entities, and thus that Helms and Kaelin owed these entities the fiduciary duties of good faith, fair dealing, fidelity, obedience, loyalty and due care. Vaughn also knew, or should have known upon minimal investigation, of Helms' and Kaelin's conduct in breach their fiduciary duties described above. Vaughn knew that he and other non-registered "brokers" were selling Vendetta Partners securities to the public without a license to do so. Vaughn agreed with Helms and Kaelin to conduct the Vendetta Offering unlawfully, by selling Vendetta Partners securities without licensure and for compensation exceeding the representations in the Vendetta Partners PPM and Form D.

a.   _Contents of the Vendetta Partners PPM and other Vendetta Offering marketing materials_

61.     Vaughn received, read and disseminated to members of the public the Vendetta Partners PPM and other Vendetta Offering marketing materials which were provided to him by Helms and Kaelin. Vaughn knew (or should have known) the contents of these materials.

62.     Vaughn knew or should have known that the Vendetta Offering was effectuated pursuant to the Securities Act of 1933 (15 U.S.C. §§77 et seq.) and Regulation D thereunder (17 C.F.R. §§ 230.501 et seq.), and that proper securities licenses and affiliations were required to

offer and sell Vendetta Partners securities. Notwithstanding this knowledge, Vaughn knowingly offered Vendetta Partners securities to the public -- through Upland Partners -- without such licenses or affiliations.

63.     Vaughn knew or should have known that through the Vendetta Partners PPM Helms and Kaelin represented that "promotional expenses" were limited to 0.1% of investor proceeds. Vaughn also knew or should have known that the Vendetta Offering Form D signed by Helms represented that Vendetta Management, Helms and Kaelin would be the only "promoters" of the Vendetta Offering. Notwithstanding this knowledge, Vaughn agreed to, and did, promote the Vendetta Offering and receive commissions -- both directly and indirectly through Upland Partners -- of approximately 6% of the investor proceeds brought into the Ponzi scheme through Upland Partners.

64.     Vaughn also knew or should have known that through the Vendetta Partners PPM Helms and Kaelin represented that 99.14% of investor proceeds would be used to purchase royalty interests. Had Vaughn conducted independent due diligence, he could have learned information regarding the actual royalty interest acquisitions by the Vendetta Entities, and the amount of royalty income received by the Vendetta Entities, each of which was well below the amounts represented to potential investors. Vaughn also could have learned that the business expenses (including his and others' commissions) and partnership distributions being made to investors were being made from investor proceeds rather than revenues from business operations.

65.     In fact, multiple potential and actual investors in the Vendetta Offering alerted Vaughn to numerous red flags associated with Vendetta Partners prior to his investment of investor proceeds through Upland Partners in October 2012. These red flags would have induced

a reasonable person to inquire further into Helms' and Kaelin's scheme. Vaughn did not inquire further, ignoring these red flags.

66.     In or about September 2012 an existing investor which Vaughn knew through his family alerted Vaughn to accounting issues of Vendetta Partners which raised concerns. Vaughn did not conduct an independent investigation into these issues or concerns after learning about them.

67.     Additionally, at least one potential investor that Vaughn attempted to recruit through Upland Partners to invest in Vendetta Partners alerted Vaughn to numerous red flags associated with Vendetta Partners in September 2012. In this regard, the potential investor questioned the accuracy of Vaughn's representations about the profitability of Vendetta Partners -- noting that it sustained losses of over $200,000 in 2010 and had sustained losses of approximately $675,000 in the first eight or so months of 2011 -- and asked how the partnership could continue to operate at a loss. Moreover, the potential investor questioned why Helms' and Kaelin's management fees (through Vendetta Management) were so high, and how Helms and Kaelin justified management fees equaling almost 14% more than revenue. The potential investor further questioned how Helms and Kaelin could sell the Vendetta Partners portfolio of assets for significantly more than the price for which they had been purchased. The potential investor stated that this investment did not suit him -- and asked if there was something he was missing -- due to Vendetta Partners' requiring additional contributions, operating at loss, the promise of a large sale of the assets above the price paid for them, and the excessively high management fees. Upon receiving this information, Vaughn failed to take any action in response to the inquiry, only forwarding it to Kaelin, who then forwarded it to Helms. Neither Helms nor Kaelin made any response. Vaughn did not follow up with respect to this inquiry.

68.     Vaughn simply did not make the inquiries he should have. Had he done so, he could have learned that Helms and Kaelin were operating a Ponzi scheme and the Vendetta Entities were insolvent. In fact, if the Vendetta Entities were operating at a loss as stated by the potential investor being recruited by Vaughn, the partnership distributions would necessarily come from investor proceeds, and not profits from operations -- the hallmark of a Ponzi scheme.

69.     Vaughn also knew or should have known that through the Vendetta Partners PPM Helms and Kaelin represented that "loan repayment" would be limited to 0.76% of investor proceeds. In reality, Helms and Kaelin made at least $1,100,000 in loan payments to Amegy Bank -- approximately three times the amount disclosed to investors in the Vendetta Partners PPM. Had Vaughn conducted independent due diligence, he could have learned that the loan payments made by Helms and Kaelin violated the terms of the offering documents they were distributing to potential investors.

70.     Vaughn also knew or should have known that Helms and Kaelin misrepresented their professional backgrounds and experience in the energy industry. Had Vaughn conducted independent due diligence, he could have learned that Helms' only meaningful industry experience consisted of his work for Robro, Vendetta Partners and related entities. Vaughn also could have learned that Kaelin's industry experience, particularly with respect to the Sandefer fund as detailed at ¶¶43, *supra*, was wholly misrepresented in offering documents and marketing materials that they disseminated to potential investors.

71.     Vaughn also knew or should have known that through the Vendetta Partners PPM Helms and Kaelin represented that there was no material litigation against Helms, Kaelin and the Vendetta Entities. Had Vaughn conducted independent due diligence, he could have learned that a private party had sued Helms and Kaelin in December 2011, alleging that they committed fraud

by purporting to sell mineral interests that they did not even own in exchange for $1.2 million, and that the Illinois EPA initiated an action against Haley Oil in May 2012. Vaughn knew or should have known that Vendetta Partners investors filed suit against Helms, Kaelin, Vendetta Partners and others in early 2013 alleging fraud.

### b.   False Representations Made to Potential Investors

72.     Vaughn knew or should have known that the returns being promised to investors were "too good to be true." See *Kriegman v. Bigelow (In re LLS Am., LLC)*, No. 09-06194-PCW11, 2013 Bankr. LEXIS 2684, at * 20 (Bankr. E.D. Wash. July 1, 2013) ("although Ponzi schemes are revealed by … payment of earlier investors with funds of later investors, … [c]ertain characteristics are often, but not invariably, present in the pattern underlying such schemes. [¶] The most common characteristic which appears to be almost invariable, is a promise of a high rate of return on the funds."); *Hecht v. Malvern Preparatory Sch.*, 716 F. Supp. 2d 395, 401 (E.D. Pa. 2010) (citing *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008)) ("If the court determines that the investor should have known the investment was 'too good to be true,' it will void the return of principal to the investor."); *SEC v. Forte*, Nos. 09-63, 09-64, 2010 U.S. Dist. LEXIS 24705, at *5 (E.D. Pa. Mar. 17, 2010) ("under PUFTA, [transferees] could be required to return their principal investments to the Estate if it were shown that … they should have seen 'red flags' that the Partnership was 'too good to be true.'").

73.     Prior to the Upland Partners subscription to the Vendetta Offering, Vaughn represented to numerous potential investors that Helms and Kaelin had been involved with several previous funds which resulted in gross returns of more than 700% to 1000% of proceeds raised. These claimed returns were too good to be true. Vaughn had no basis for these representations apart from, and independent of, information provided to him by Helms and

Kaelin. Vaughn performed no independent due diligence with respect to these claimed returns. Had Vaughn conducted independent due diligence in this regard, he could have learned that Helms and Kaelin did not have the oil and gas industry experience they represented in marketing materials, and any funds Helms and Kaelin were involved with prior to Vendetta Partners did not have the returns that they represented in marketing materials. Moreover, he would have learned that the royalty income received by the Vendetta Entities could not support a representation that such returns were possible, and that Helms and Kaelin's royalty interest acquisitions fell far below the representations made in the Vendetta Partners PPM and other marketing materials.

74.     Vaughn was aware of additional facts which should have placed him on inquiry notice of Helms and Kaelin's fraud. In fact, Vaughn was aware of several investors who grew increasingly unhappy with Helms' and Kaelin's management of Vendetta Partners, accusing Helms and Kaelin of operating a fraudulent scheme. These same investors filed suit against Helms, Kaelin, Vendetta Partners and others in early 2013.

75.     For the reasons stated herein, Vaughn cannot establish that he received any transfers from the Vendetta Entities with objective good faith. Accordingly, because these transfers were made from a Ponzi scheme, they are avoidable by the Receiver.

### E.  Vaughn did not Provide Reasonably Equivalent Value for the Transfers

76.     Vaughn did not provide reasonably equivalent value for the transfers he received from Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals. To the extent any action taken by Vaughn with respect to these transfers could be considered a "service," such "services" were in furtherance of the Vendetta Ponzi scheme and conferred no value upon the Receivership Estate. Pursuant to holdings of the U.S. Court of Appeals for the Fifth Circuit, services provided in furtherance of a Ponzi scheme do not constitute reasonably

equivalent value as a matter of law. See *Byron*, 436 F.3d at 560 ("It takes cheek to contend that in exchange for the payments he received, the … Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments. … This argument is unacceptable."). Vaughn's actions as the *de facto* -- if not the actual -- Chief Operating Officer of Vendetta Partners also furthered the Vendetta Ponzi scheme.

## V.   CAUSES OF ACTION

77.   For each of the following causes of action, Plaintiff incorporates by reference and reasserts the allegations above as if fully set forth below.

**COUNT I:   Avoidance of Fraudulent Transfers Made to, or for the benefit of, Vaughn pursuant to TUFTA §24.005(a)(1)**

78.   Helms and Kaelin operated a fraudulent Ponzi scheme through the Vendetta Entities, including Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals. The Vendetta Entities were inextricably intertwined by Helms and Kaelin, who operated these entities as a single fraudulent enterprise.

79.   Helms and Kaelin made transfers totaling at least $295,858.89 from Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals to, or for the benefit of, Vaughn. **Exhibit A**. Helms and Kaelin made these transfers from the Ponzi scheme alleged herein with actual intent to hinder, delay or defraud creditors of the Vendetta Entities.

80.   Vaughn did not provide reasonably equivalent value for the transfers made to him or for his benefit by Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals. To the extent any action taken by Vaughn with respect to these transfers could be considered a "service," such "services" were in furtherance of the Vendetta Ponzi scheme,

conferred no value upon the Receivership Estate, and do not constitute reasonably equivalent value as a matter of law. See, *e.g.*, *Byron*, 436 F.3d at 560 ("It takes cheek to contend that in exchange for the payments he received, the … Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments. … This argument is unacceptable"). Vaughn's actions as the *de facto* -- if not the actual -- Chief Operating Officer -- and therefore insider -- of Vendetta Partners also furthered the Vendetta Ponzi scheme.

81.     Vaughn cannot demonstrate objective good faith in receiving the transfers from Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals. Vaughn was aware of numerous red flags with respect to the Vendetta and Iron Rock Offerings, the representations made in the Vendetta Partners PPM, and his marketing efforts on behalf of the Vendetta Ponzi scheme. Vaughn was aware of sufficient facts that would put him on inquiry notice of Helms and Kaelin's fraud and the Vendetta Defendants' possible insolvency. Vaughn knew or should have known the limits of Promotional Expenses represented in the Vendetta Partners PPM (and of amounts represented to the Commission in the aforementioned Form D) and that he received amounts far in excess of those limits. Vaughn also knew or should have known that the high returns on the Vendetta Partners partnership interests that he -- and Helms and Kaelin -- represented to potential investors were too good to be true. Vaughn was aware of investor concerns that the Vendetta Entities were potentially insolvent and were operated as a Ponzi scheme as early as September 2012, but failed to conduct any independent due diligence or investigation into the Vendetta Defendants. Vaughn also knew or should have known that the transfers he received from Barefoot Minerals were from an entity for which he performed no services whatsoever.

82.     The Receiver was only able to discover the fraudulent nature of the transfers from Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals to, and for the benefit of, Vaughn after Helms and Kaelin were removed from control of the Vendetta Entities and after a time-consuming and extensive review of thousands of pages of paper and electronic records and documents relating to the Vendetta Defendants.

83.     The Receiver is entitled to the avoidance of the fraudulent transfers from Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals to or for the benefit of Vaughn in the amounts alleged herein.

84.     The Receiver also is entitled to costs and reasonable attorney's fees related to the commencement and prosecution of this litigation pursuant to TUFTA §24.013.


**COUNT II:    Unjust Enrichment**

85.     The Receiver is entitled to disgorgement of the transfers made from the Vendetta Ponzi scheme -- in particular, from accounts in the name of Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals -- to or for the benefit of Vaughn, pursuant to the doctrine of unjust enrichment under applicable law. Vaughn received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to defrauded investors and creditors with claims against the Receivership Estate, and that Vaughn received through the taking of undue advantage vis-à-vis the investors in the Vendetta Ponzi scheme through his participation in the unlawful Vendetta Offering.

86.     Vaughn has been unjustly enriched by such funds, at the expense of defrauded investors in and creditors of the Vendetta Ponzi scheme, and it would be unconscionable for him to retain these funds.

87.     In order to carry out his duties as ordered by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the transfers received by or for the benefit of Vaughn.

88.     Vaughn has been unjustly enriched by his receipt of transfers from Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals. The Receiver, therefore, is entitled to disgorgement of all transferred funds he received. Pursuant to the equity powers of this Court, the Receiver seeks a judgment that: (a) funds transferred to Vaughn from Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals unjustly enriched him; (b) funds transferred to Vaughn from Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; and (c) Vaughn is liable to the Receiver for amounts equaling the amount of funds transferred to him, or for his benefit, from Vendetta Partners, Vendetta Management, Iron Rock Partners and Barefoot Minerals.

89.     The Receiver is also entitled to costs and reasonable attorney's fees related to the commencement and prosecution of this litigation.

**COUNT III:   Aiding, Abetting or Participation in Breaches of Fiduciary Duties**

90.     Helms and Kaelin owed fiduciary duties to the Vendetta Entities and therefore owed fiduciary duties to the Receiver. Helms and Kaelin breached their fiduciary duties to the Vendetta Entities by effecting the unlawful Vendetta Offering, by causing such companies to engage in illegal activity, by failing to use reasonable care in operating and managing such companies, by failing to operate such companies in a reasonably prudent manner, and by failing to operate such companies in compliance with all applicable laws and regulations. For example, Helms and Kaelin breached their fiduciary duties by allowing non-registered "brokers" such as

Vaughn to recommend the purchase of Vendetta Partners securities to the public and compensate them in excess of the limits disclosed in the Vendetta Partners PPM (and in excess of amounts represented to the Commission in the aforementioned Form D). Additionally, Helms and Kaelin breached their fiduciary duties by misappropriating millions of dollars worth of assets of the Vendetta Entities for the payment of personal expenses, business expenses (including without limitation undisclosed commissions and other fees to unlicensed "brokers"), and fraudulent Ponzi Profits, none of which were disclosed to investors.

91.     The fiduciary breaches of Helms and Kaelin enabled and assisted in the misappropriation of millions of dollars in assets from the Vendetta Entities. As a result of these fiduciary breaches, the Vendetta Entities, and therefore the Receiver, suffered damages.

92.     Defendant knowingly or recklessly aided, abetted, or participated in these breaches of fiduciary duties. Defendant knew that Helms and Kaelin owed fiduciary duties to the Vendetta Entities, and Defendant was aware that Helms and Kaelin were breaching their fiduciary duties. Defendant also knew that he was aiding, abetting, or participating in these breaches of fiduciary duties by the conduct alleged herein, including without limitation his unlicensed sale of Vendetta Partners securities and his insider status and work as the *de facto* -- if not the actual -- Chief Operating Officer of Vendetta Partners, and as Chief Operating Officer of Iron Rock Partners. The fiduciary breaches by Helms and Kaelin and Vaughn's participation in these breaches were a proximate cause of actual damages to the Vendetta Entities, and therefore the Receiver. Defendant knew or should have known that his aiding, abetting, or participation in these breaches of fiduciary duties would result in extraordinary harm to the Vendetta Entities and therefore to the Receiver. Accordingly, the Receiver is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

**COUNT IV:   Aiding, Abetting or Participation in Fraud**

93.     By his conduct described herein, Defendant aided, abetted, and/or participated with Helms and Kaelin in a fraudulent scheme against the Vendetta Entities, and therefore against the Receiver. In particular, Defendant's "brokerage" and other services assisted an unlawful securities offering and fraudulent scheme, enabling and assisting Helms and Kaelin in misappropriating millions of dollars in assets from the Vendetta Entities, and therefore from the Receiver, including the payment of undisclosed commissions and other fees to unlicensed brokers like Vaughn. Defendant knowingly participated in the unlawful Vendetta Offering without licensure. Defendant, an insider, also participated in Helms' and Kaelin's fraud as the *de facto* -- if not the actual -- Chief Operating Officer of Vendetta Partners, and as Chief Operating Officer of Iron Rock Partners. As a result of this conduct, Defendant is directly liable for fraud, and Defendant's actions, in combination with the actions of Helms and Kaelin, are a proximate cause of actual damages to the Vendetta Entities, and therefore to the Receiver.

**COUNT V:    Aiding, Abetting or Participation in Conversion**

94.     The Vendetta Entities, and therefore the Receiver, owned, possessed, or had the right to immediate possession of personal property. Helms and Kaelin wrongfully exercised dominion or control over such property, and thereby misappropriated millions of dollars in such property from the Vendetta Entities, thereby causing damages to the Vendetta Entities, and therefore the Receiver. These misappropriations included, without limitation, compensating unlicensed "brokers" in amounts far exceeding limits disclosed to investors (and of amounts represented to the Commission in the aforementioned Form D).

95.     By his conduct described herein, Defendant knowingly or recklessly aided, abetted, or participated in this misappropriation and conversion of millions of dollars in property

from the Vendetta Entities, and therefore from the Receiver. Defendant was aware that Helms and Kaelin were wrongfully exercising dominion or control over the Vendetta Entities' personal property, and Defendant was also aware that he was aiding, abetting, or participating in this wrongful conversion of the Vendetta Entities' personal property. The wrongful conversion of property by Helms and Kaelin was a proximate cause of actual damages to the Vendetta Entities, and therefore to the Receiver. As a result, the Vendetta Entities, and therefore the Receiver, has suffered injury.

## COUNT VI:   Civil Conspiracy

96.     Defendant conspired with Helms and Kaelin to commit the wrongful conduct described herein, including the unlawful Vendetta Offering, breaches of fiduciary duties, participation in a fraudulent scheme and conversion. Defendant is responsible for all wrongdoing done by each of the other members of the conspiracy, including Helms and Kaelin, in furtherance of the unlawful conspiracy and enterprise. In particular, Defendant is responsible for Helms and Kaelin's unlawful offer and sale of securities through unlicensed "brokers" and the undisclosed compensation of those "brokers" through the misappropriation and conversion of assets of the Vendetta Entities, through which Helms and Kaelin misappropriated millions of dollars in assets from the Vendetta Entities, and therefore from the Receiver.

97.     There was a meeting of the minds between Helms, Kaelin and Defendant beginning in or about July 2012 and continuing through the commencement of the Enforcement Action to accomplish a lawful purpose by unlawful means -- namely the offering of Vendetta Partners securities through unlicensed "brokers" in exchange for compensation which facially violated the Vendetta Partners PPM (and representations to the Commission in the aforementioned Form D). In this meeting of the minds, Defendant agreed to assist Helms and

Kaelin in unlawfully offering Vendetta Partners securities -- without being licensed to do so -- to the public for compensation of approximately 6% of proceeds raised. Such action was crucial and central to the perpetuation of the Vendetta Ponzi scheme, which included the misappropriation of millions of dollars from the Vendetta Entities, and therefore the Receiver. In this meeting of the minds, Defendant agreed to assist Helms and Kaelin in concealing the fraudulent nature of their activities by evading regulatory requirements in the offer and sale of securities, which was crucial and central to the perpetuation of the Vendetta Ponzi scheme. Defendant therefore knowingly combined together with Helms and Kaelin in the unlawful, unlicensed offer and sale of securities for undisclosed compensation.

98.     As described herein, Defendant took various overt acts designed to assist Helms and Kaelin to accomplish the goal of unlawfully offering and selling Vendetta Partners securities and therefore furthering the Vendetta Ponzi scheme. These overt acts in furtherance of the conspiracy included providing prospective investors with offering documents and other marketing materials which included information known by Defendant to be false, such as the compensation of Defendant's promotion of the Vendetta Offering -- which was far in excess of the disclosures in the Vendetta Partners PPM (and of amounts represented to the Commission in the aforementioned Form D). By doing so, Defendant acted pursuant to his meeting of the minds with Helms and Kaelin in pursuit of the common purpose of the conspiracy: to offer and sell Vendetta Partners securities by unlawful means and misappropriate assets of the Vendetta Entities. Defendant's conspiracy with these co-conspirators to breach fiduciary duties, participate in a fraudulent scheme, fraudulently transfer assets, and convert the Vendetta Entities' property is a proximate cause of actual damages to the Vendetta Entities, and therefore to the Receiver.

99.    Defendant's actions in furthering the conspiracy to offer and sell Vendetta Partners securities by unlawful means and misappropriate assets of the Vendetta Entities were taken during the conspiracy's operation. Indeed, Defendant's actions were taken to extend the Vendetta Ponzi scheme so that the Vendetta Ponzi scheme could continue and the Vendetta Entities could continue paying Defendant's compensation. Therefore, Defendant's actions were part of a continuing activity that was illegal in nature and essential to furthering the survival of an ongoing conspiracy. But for the overt acts taken by members of the conspiracy to further the conspiracy's objectives as described herein, Helms, Kaelin and their co-conspirators (including Defendant) would not have been able to execute the unlawful Vendetta Offering and Ponzi scheme, and millions of dollars in damages to the Vendetta Entities, and therefore to the Receiver, would have been avoided.

## VI.   ACTUAL DAMAGES

100.    The Vendetta Entities, and therefore the Receiver, have suffered the loss of approximately $295,858.89 in funds fraudulently transferred from the Vendetta Ponzi scheme to Defendant as alleged herein. The Vendetta Entities, and therefore the Receiver, have further suffered the loss of millions of dollars that were proximately caused by the wrongful conduct of Defendant and his co-conspirators, including Helms and Kaelin, as described herein, through which he aided, abetted and participated in Helms' and Kaelin's unlawful Vendetta Offering and fraudulent Ponzi scheme, and misappropriation of assets of the Vendetta Entities. In addition, the Receiver is entitled to recover his just and reasonable attorneys' fees and costs, subject to Court approval, for it would be inequitable not to award such fees to him.

## VII.  PUNITIVE DAMAGES

101.    The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect. The Receiver is entitled to recover punitive damages in an amount necessary to punish the Defendant and to deter similar conduct of others in the future.

## VIII.  CONDITIONS PRECEDENT

102.    All conditions precedent to filing this Complaint have been met.

## IX.  PRAYER

WHEREFORE, the Receiver requests that the Defendant be summoned to answer this Complaint, that the case be set for trial, and that upon final judgment the Receiver recovers the damages as alleged herein, including without limitation approximately $295,858.89 fraudulently transferred to and for the benefit of Defendant and other actual damages, punitive damages, and costs and expenses of suit, including reasonable attorneys' fees. The Receiver prays for such other relief to which he may be justly entitled.

Dated: July 30, 2015                    Respectfully submitted,

                                        THE TAYLOR LAW OFFICES, P.C.

                                        By:   /s/ Andrew M. Goforth

                                        Andrew M. Goforth
                                        Texas State Bar: 24076405
                                        *goforth@tltaylorlaw.com*

                                        4550 Post Oak Place Drive, Suite 241
                                        Houston, Texas 77027
                                        Tel: 713.626.5300
                                        Fax: 713.402.6154

                                        COUNSEL FOR RECEIVER
                                        THOMAS L. TAYLOR III